Nos. 23-55466, 23-55474, 23-55557

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

JOHN DOE, on behalf of himself and all others similarly situated,
*Plaintiff – Appellee*
v.
CEDARS-SINAI HEALTH SYSTEM; CEDARS-SINAI MEDICAL CENTER,
*Defendants – Appellants*

JARROD BROWNE,
*Plaintiff – Appellee*
v.
CEDARS-SINAI HEALTH SYSTEM; CEDARS-SINAI MEDICAL CENTER,
*Defendants – Appellants*

STEVEN BELTRAN; LISA REINGOLD, individually and on behalf of all others
similarly situated,
*Plaintiffs – Appellees*
v.
CEDARS-SINAI HEALTH SYSTEM; CEDARS-SINAI MEDICAL CENTER,
*Defendants – Appellants*

Appeal From The United States District Court
For The Central District of California, Los Angeles
The Honorable Dale S. Fischer
Case No. 2:23-cv-00870-DSF-JPR
Case No. 2:23-cv-01551-DSF-JPR
Case No. 2:23-cv-02626-DSF-JPR

## JOINT ANSWERING BRIEF OF PLAINTIFFS-APPELLEES JOHN DOE, JARROD BROWN, STEVEN BELTRAN AND LISA REINGOLD

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Rachele R. Byrd
750 B Street, Suite 1820
San Diego, CA 92101
(619) 239-4599
(619) 234-4599 (fax)

*Counsel for Plaintiff/ Appellee John Doe*

**DRURY LEGAL, LLC**
Scott R. Drury
6 Carriage Lane
Highwood, Illinois 60040
(312) 358-8225
scott@drurylegal.com

*Counsel for Plaintiff/ Appellee Jarrod Browne*

**BARRACK RODOS & BACINE**
Samuel M. Ward
600 West Broadway
Suite 900
San Diego, CA 92101
(619) 230-8088
(619) 230-1874 (fax)
sward@barrack.com

*Counsel for Plaintiffs/ Appellees Steven Beltran and Lisa Reingold*

## <u>TABLE OF CONTENTS</u>

<b><u>Page(s)</u></b>

I.  STATEMENT OF JURISDICTION ........................................................1

II.  STATEMENT OF THE ISSUES ..........................................................1

III.  ADDENDUM TO BRIEF....................................................................1

IV.  STATEMENT OF THE CASE .............................................................2

    A.  Statement of Facts........................................................................3

    B.  Procedural History .......................................................................9

V.  SUMMARY OF THE ARGUMENT ....................................................12

VI.  STANDARD OF REVIEW .................................................................14

VII.  ARGUMENT.......................................................................................15

    A.  Defendants Were not Acting Under the Direction of a
        Federal Officer..............................................................................15

        1.  Even a Broad Reading of the Federal Officer Removal
            Statute Does Not Support Defendants' Position. .....................16

        2.  Defendants' Compliance with Government Regulations does
            not Constitute "Acting Under" the Direction of a Federal
            Officer. ....................................................................................17

        3.  Defendants Wrongly Apply Appellate Court Jurisprudence....23

        4.  Defendants' Effort to Tether Federal Jurisdiction to the
            "Meaningful Use Program" Has Been Widely Rejected..........27

    B.  No Causal Connection Exists Between Actions Defendants Were
        Purportedly Asked to Take Pursuant to a Federal Officer's Direction
        and Plaintiffs' Claims. ...................................................................30

C.   Cedars-Sinai Lacks a Colorable Federal Defense. ............................36

VIII.  CONCLUSION ...........................................................................40

# TABLE OF AUTHORITIES

**CASES**                                                                 **Page(s)**

*AMA Multimedia, LLC v. Marcin Wanat*,
   970 F.3d 120 (9th Cir. 2019) ..............................................................35

*Az. v. Maypenny*,
   451 U.S. 232 (1981) ............................................................................16

*Beauford v. Johns Hopkins Health System Corp.*,
   No. JKB-23-0660, 2023 WL 4237373 (D. Md. June 28, 2023) .........29

*Buckman Co. v. Plaintiffs' Legal Committee*,
   531 U.S. 341 (2001) ............................................................................38

*Butler v. Coast Electric Power Association*,
   926 F.3d 190 (5th Cir. 2019) ..............................................................25

*Cabalce v. Thomas E. Blanchard & Associates*,
   797 F.3d 720 (9th Cir. 2015) ........................................... 19, 21, 23, 24

*Caver v. Central Alabama Electric Cooperative*,
   845 F.3d 1135 (11th Cir. 2017) ..........................................................26

*Cessna v. Rea Energy Cooperative, Inc.*,
   753 F. App'x 124 (3d Cir. 2018) .........................................................26

*City & County of Honolulu v. Sunoco LP*,
   39 F.4th 1101 (9th Cir. 2022) .....................................................*passim*

*Colleton v. UMass Memorial Health Care, Inc.*,
   No. 22-cv-40154-ADB, 2023 WL 4538178 (D. Ma. July 13, 2023) ...................29

*Cnty. of San Mateo v. Chevron Corp.*,
   32 F.4th 733 (9th Cir. 2022), *cert. denied sub nom.*
   *Chevron Corp. v. San Mateo County, California*,
   143 S. Ct. 1797 (2023) ...............................................................*passim*

*Crouch v. St. Agnes Medical Center*,
   No. 1:22-cv-01527-ADA-EPG, 2023 WL 3007408 (E.D. Cal. Apr. 18, 2023)...28

*Doe v. Christ Hosp.*,
   No. 1:23-cv-27, 2023 WL 4757598 (S.D. Ohio July 26, 2023) .........................28

*Doe v. Hoag Memorial Presbyterian Hospital*,
   No. SACV 23-00444-CJC, 2023 WL 3197716 (C.D. Cal. May 2, 2023) ...........27

*Doe v. ProMedica Health System, Inc.*,
   No. 3:20 CV 1581, 2020 WL 7705627 (N.D. Oh. Oct. 30, 2020)...............*passim*

*Doe v. Redeemer Health*,
   No. 23-2405, 2023 WL 6323089 (E.D. Pa. Sept. 28, 2023)...............................29

*Doe v. SSM Health Care Corp.*,
   No. 4:23-cv-00022-SRC, 2023 WL 5662099 (E.D. Mo. Aug. 22, 2023)............28

*Doe v. Umass Mem'l Health Care, Inc.*,
   No. 22-cv-12022-ADB, 2023 WL 4538239 (D. Ma. July 13, 2023)...................29

*Doe v. UPMC*,
   No. 2:20-cv-359, 2020 WL 4381675 (W.D. Pa. July 31, 2020).............27, 28, 29

*Enrich v. Touche Ross & Co.*,
   846 F.2d 1190 (9th Cir. 1988) ...........................................................................15

*Gaus v. Miles Inc.*,
   980 F.2d 564 (9th Cir. 1992)..............................................................................15

*Gibson v. Stanford Health Care*,
   No. 23-cv-02320-BLF, 2023 WL 741337 (N.D. Cal. Nov. 9, 2023)..................27

*Goncalves v. Rady Children's Hospital San Diego*,
   865 F.3d 1237 (9th Cir. 2017)..........................................................23, 24, 30, 34

*Harris v. Bankers Life & Casualty Co.*,
   425 F.3d 689 (9th Cir. 2005)..............................................................................15

*Hidalgo-Semlek v. Hansa Medical, Inc.*,
    498 F. Supp. 3d 236 (D.N.H. 2020) .................................................37

*Hudak v. Elmcroft of Sagamore Hills*,
    58 F.4th 845 (6th Cir. 2023)................................................................21

*In re Commonwealth's Motion to Appoint Counsel Against or Directed to
    Defender Association of Philadelphia*,
    790 F.3d 457 (3d Cir. 2015)................................................................39

*Isaacson v. Dow Chemical Co.*,
    517 F.3d 1237 (2d Cir. 2008) ..........................................23, 30, 31, 33

*Jacks v. Meridian Res. Co.*,
    701 F.3d 1224 (8th Cir. 2012)............................................................24

*Lively v. Wild Oats Markets, Inc.*,
    456 F.3d 933 (9th Cir. 2006)..............................................................14

*Martin v. LCMC Health Holdings, Inc.*,
    No. 23-411, 2023 WL 4540547 (E.D. La. July 5, 2023)....................28

*Martin v. Petersen Health Operations, LLC*,
    37 F.4th 1210 (7th Cir. 2022)............................................................21

*Mitchell v. Advanced HCS, L.L.C.*,
    28 F.4th 580 (5th Cir. 2022)..............................................................21

*Pac. Radiation Oncology, LLC v. Queen's Medical Center*,
    47 F. Supp. 3d 1069 (D. Haw. 2014).................................................37

*Papp v. Fore-Kast Sales Co., Inc.*,
    842 F.3d 805 (3d Cir. 2016)...............................................................20

*Quinto v. Regents of the University of California*,
    No. 3:22-cv-04429-JD, 2023 WL 1448050 (N.D. Cal. Feb. 1, 2023) ...........25, 28

*Saldana v. Glenhaven Healthcare, LLC*,
    27 F.4th 679 (9th Cir. 2022)........................................................19, 21

*Sherod v. Comprehensive Healthcare Management Services, LLC*,
   No. 20-3287, 2023 WL 6290741 (3d Cir. Sept. 27, 2023)..................................21

*Smith v. Facebook*,
   262 F. Supp. 3d 943 (N.D. Cal. 2017) ..................................38

*Solomon v. St. Joseph Hosp.*,
   62 F.4th 54 (2d Cir. 2023)..................................21

*Valladolid v. Memorial Health Servs.*,
   No. CV 23-3007-MWF (ASX), 2023 WL 4236179 (C.D. Cal. June 27, 2023) ..27

*Tenn. v. Davis*,
100 U.S. 257 (1879)..................................16

*Watson v. Philip Morris Cos., Inc.*,
   551 U.S. 142 (2007)..................................*passim*

*Willingham v. Morgan*,
   395 U.S. 402 (1969)..................................17

*Wilson v. Republic Iron & Steel Co.*,
   257 U.S. 92 (1921)..................................15

## STATUTES

28 U.S.C. § 1442(a)(1)..................................*passim*
42 U.S.C. § 1320d-7(a)(1) ..................................38
42 U.S.C. § 1395w-4 ..................................11

45 C.F.R. § 160.203 ..................................38

Cal. Const. art. I, § 1 ..................................9, 10

California Confidentiality of Medical Information Act ("CMIA")
   (Cal. Civ. Code § 56, *et seq.*) ..................................9, 10

California Invasion of Privacy Act
   (Cal. Penal Code §§ 630, 631, 632, *et seq.*)..................................9, 10

California Unfair Competition Law ("UCL")
  (Cal. Bus. & Prof. Code § 17200, *et seq.*) ............................................9

Health Insurance Portability and Accountability Act ("HIPAA")
  (42 U.S.C. § 1320d, *et seq.*)............................................................*passim*

Mississippi Code § 77-5-235(5) ............................................................25

## OTHER AUTHORITIES

Federal Trade Commission, Federal Trade Commission, *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies* (July 20, 2023) available at: https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking (last visited Nov. 22, 2023)..............................................................8, 9

U.S. Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), available at: https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Nov. 27, 2023) ..........................................6

## I.       STATEMENT OF JURISDICTION

Plaintiffs/Appellees John Doe, Jarrod Browne, Steven Beltran, and Lisa Reingold (collectively, "Plaintiffs") agree with the jurisdiction statement of Defendants/Appellants Cedars-Sinai Health Center and Cedars-Sinai Medical Center (collectively, "Defendants").

## II.      STATEMENT OF THE ISSUES

The issues presented for appeal are:

1.       Whether, by participating in the Meaningful Use program, Defendants were acting under a federal officer as required by the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

2.       Whether Defendants have demonstrated by a preponderance of the evidence a causal connection between: (a) the actions Defendants purportedly took pursuant to a federal officer's direction; and (b) Plaintiffs' claims that Defendants unlawfully implemented tracking code on their website.

3.       Whether Defendants have demonstrated by a preponderance of the evidence that they engaged in any official duties through implementation of tracking code on their website that provides a colorable federal defense.

## III.     ADDENDUM TO BRIEF

The applicable constitutional provisions, treaties, statutes, ordinances, regulations, or rules are contained in the addendum of Appellants/Defendants.

## IV.   STATEMENT OF THE CASE

Defendants in these three consolidated appeals challenge the District Court's Orders remanding the actions to State Court for Defendants' failure to demonstrate that removal was proper under the federal officer removal statute, 28 U.S.C. § 1442(a)(1). The actions underlying these appeals challenge Defendants' implementation of tracking code, such as the Facebook Pixel and others, on their website that unlawfully disclosed to third parties without Plaintiffs' and other patients' consent their personally identifiable information ("PII") and personal health information ("PHI"). When using Defendants' website in the manner encouraged by Defendants, patients convey highly private information, including health conditions for which they seek doctors and other private medical information.  Contrary to Plaintiffs' and the other class members' reasonable expectation that Defendants would take appropriate steps to maintain the privacy of these communications, the information was transferred to Facebook, Inc., now known as Meta Platforms, Inc. ("Facebook") along with a code that linked the information to their identities. Defendants' conduct violates state statutory and common law, is contrary to Defendants' own Privacy Policy, is contrary to the policies of Facebook and Google LLC ("Google"), and is contrary to specific guidance provided by the Department of Health and Human Services' Office for Civil Rights ("OCR"), which stated that health care providers cannot use third-

party tracking tools in a manner that would result in impermissible disclosures of PHI.

The District Court remanded each case, properly holding that Defendants did not satisfy the requirements for removal under the federal officer removal statute. The cases were remanded weeks before Defendants filed the respective notices of appeal and are currently proceeding in state court.

### A. Statement of Facts

Defendants are major healthcare organizations based in Los Angeles, California. 3-ER-441 ¶¶ 15-16; 3-ER-484 ¶ 1; 3-ER-585-86 ¶¶ 6-7. Defendants maintain a website and a mobile application or "app" (together, the "Website") through which they communicate with their more than one million patients. 3-ER-439 ¶ 6; 3-ER-441 ¶ 15; 3-ER-484 ¶ 1; 3-ER-589 ¶¶ 20-22. Among other things, Defendants encourage patients to use this Website to research their medical symptoms and health issues, identify doctors who can treat their specific conditions, make appointments with those doctors, and take other actions related to their personal health care. 3-ER-439 ¶ 6; 3-ER-445 ¶ 36; 3-ER-446-47 ¶ 43; 3-ER-484 ¶ 1; 3-ER-589 ¶ 22.

Defendants' statement that "Plaintiffs do not assert that Cedars-Sinai discloses **names**, social security numbers, **diagnoses**, birth dates, or **comparable information** to third parties" (Br. at 22, emphasis added) is simply inaccurate.

Plaintiff Doe alleges that "if a patient made an appointment with a doctor for treatment of cancer, the tracking code Cedars-Sinai put on its Website conveyed that information to Meta" (3-ER-485 ¶ 6), and "Defendant[s] ha[ve] passed along Plaintiff's and Class members' search terms about health conditions for which they seek doctors" (3-ER-506 ¶ 104). Plaintiff Doe alleges that patients' Facebook ID numbers (or c_user codes) were transmitted to Meta, and those ID numbers are easily connected with the patients' names on Facebook. 3-ER-494 ¶ 47. "That means that the private medical information a person enters onto Defendant[s'] Website that is transferred with their c_user code can be easily linked to the person themselves." 3-ER-494 ¶ 48. *See also* 3-ER-440 ¶ 10; 3-ER-442 ¶¶ 22-24; 3-ER-592 ¶ 30; 3-ER-593 ¶¶ 33, 37; 3-ER-594 ¶ 43.

When using the Website in the manner encouraged by Defendants, patients convey highly private information, including PHI and PII, information protected from disclosure by the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. § 1320d, *et seq*. ("HIPAA"). 3-ER-439 ¶ 6; 3-ER-445 ¶ 36; 3-ER-446-47 ¶ 43; 3-ER-448 ¶ 50; 3-ER-449 ¶ 51; 3-ER-484 ¶ 1; 3-ER-589 ¶ 22. Plaintiffs and the other members of the class conveyed this information with the reasonable expectation that Defendants would take appropriate steps to maintain the privacy of these communications. 3-ER-439 ¶ 5; 3-ER-440 ¶ 9; 3-ER-443-48 ¶¶ 28-49; 3-ER-460 ¶ 118; 3-ER-484 ¶ 2; 3-ER-601 ¶ 80. Instead, unbeknownst to

Plaintiffs and other patients of Defendants, and contrary to the patients' reasonable expectations of privacy, Defendants embedded tracking code in their Website that caused Plaintiffs' and other patients' PHI and PII to be shared with unrelated third parties, including Facebook, Google, Microsoft Corporation (Bing), and other marketing and social media platforms and businesses. 3-ER-439 ¶ 7 & n.2; 3-ER-440 ¶¶ 10, 11; 3-ER-456 ¶ 87; 3-ER-484 ¶ 3; 3-ER-487 ¶¶ 18-19; 3-ER-592-93 ¶ 32. The tracking code included Facebook's Pixel and Google Analytics, among others. 3-ER-484 ¶¶ 22-74; 3-ER-592-93 ¶ 32. Defendants never obtained their patients' consent to share their PHI and PII with third parties for purposes unrelated to services the patients requested. 3-ER-439 ¶ 5; 3-ER-440 ¶ 8; 3-ER-443 ¶ 25; 3-ER-500 ¶ 75; 3-ER-586 ¶ 11; 3-ER-594 ¶ 44; 3-ER-598 ¶ 59; 3-ER-599 ¶ 64.

Defendants' conduct violates state statutory and common law, is contrary to Defendants' own Privacy Policy, is contrary to Facebook's and Google's policies, and is contrary to specific guidance provided by the OCR. 3-ER-505-06, ¶¶ 101-05.

In December 2022, the OCR issued a bulletin titled, "Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates" (the

"Bulletin"). 3-ER-505-06 ¶¶ 101-103.[1] The OCR stated that, while healthcare organizations regulated under HIPAA may use third-party tracking tools in a limited way to collect and analyze information about how users interact with their websites or mobile applications, they cannot use the tools in a manner that would result in impermissible disclosures of PHI or other violations of the HIPAA rules:

> **[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules**. For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.
>
> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule [45 CFR part 160 and subparts A and E of part 164] but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While *it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors*, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that

---

[1] *See* Plaintiffs'/Appellees' Request for Judicial Notice ("RJN"), filed concurrently herewith, Ex. A, U.S. Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), available at: https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Nov. 27, 2023).

they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.

. . . This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, or any unique identifying code. All such [individually identifiable health information (IIHI)] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services. This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.

3-ER-506, ¶¶ 102-06 (second emphasis added).

Relatedly, in July 2022, the Federal Trade Commission ("FTC") and the Department of Health and Human Services ("HSS") issued a joint press release warning hospitals about the privacy and security risks arising from the use of online tracking technologies:

The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth providers about the privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties.

"When consumers visit a hospital's website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the

FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."

"Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health information when using a hospital's website," said Melanie Fontes Rainer, OCR Director. "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."

The two agencies sent the joint letter to approximately 130 hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app.

In their letter, both agencies reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties. For example, the disclosure of such information could reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment.

. . . Through its recent enforcement actions against BetterHelp, GoodRx and Premom, as well as recent guidance from the FTC's Office of Technology, the FTC has put companies on notice that they must monitor the flow of health information to third parties that use tracking technologies integrated into websites and apps. The unauthorized disclosure of such information may violate the FTC Act and could constitute a breach of security under the FTC's Health Breach Notification Rule. . . .[2]

---

[2]     *See* RJN, Ex. B,  Federal Trade Commission, *Federal Trade Commission, FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and*

Therefore, Defendants' conduct is directly contrary to clear pronouncements by the FTC and HHS—the very governmental agency under whose direction Defendants now claim they were acting.

### B. Procedural History

On December 30, 2022, Plaintiff John Doe filed his Class Action Complaint against Defendants in the Superior Court of the State of California in and for the County of Los Angeles ("Los Angeles Superior Court"). 4-ER-606. Plaintiff Doe's Complaint alleges the following causes of action: (1) Violation of the California Invasion of Privacy Act (Cal. Penal Code §§ 630, 631, *et seq.*); (2) Violation of the California Invasion of Privacy Act (Cal. Penal Code § 632, *et seq.*); (3) Invasion of Privacy/Intrusion upon Seclusion in Violation of California Common Law and the California Constitution, art. 1, § 1; (4) Breach of Implied Contract; (5) Breach of Contract – Third-Party Beneficiaries; (6) Breach of Implied Covenant of Good Faith and Fair Dealing; (7) Negligence; (8) Violations of California's Confidentiality of Medical Information Act (Cal. Civ. Code § 56, *et seq.*) (the "CMIA"); and (9) Violation of the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*) (the "UCL"). 4-ER-638-53, ¶¶ 140-238.

On January 10, 2023, Plaintiff Jarrod Browne filed a Class Action

---

*Security Risks from Online Tracking Technologies* (July 20, 2023) available at: https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking (last visited Nov. 27, 2023).

Complaint against Defendants in the Los Angeles Superior Court. 3-ER-584. Plaintiff Browne alleges the following causes of action: (1) Violation of the California Invasion of Privacy Act, Cal. Penal Code § 631; (2) Violation of the CMIA; and (3) Invasion of Privacy Under California's Constitution. 3-ER-597-602, ¶¶ 55-83.

On February 23, 2023, Plaintiffs Steven Beltran and Lisa Reingold filed a Class Action Complaint in the Los Angeles Superior Court. 3-ER-437. Plaintiffs Beltran and Reingold allege the following causes of action: (1) Negligence; (2) Negligence *Per Se*; (3) Breach of Implied Contract; (4) Breach of Implied Covenant of Good Faith and Fair Dealing; (5) Breach of Fiduciary Duty; (6) Breach of Duty; (7) Violation of the California Invasion of Privacy Act, California Penal Code §§ 630, 631, and 632 *et. seq*.; (8) Violation of the CMIA; (9) Invasion of Privacy under California's Constitution; and (10) Violation of the UCL. 3-ER-453-63 ¶¶ 64-145.

Defendants removed the *Doe*, *Brown*, and *Beltran* actions to the United States District Court for the Central District of California on February 3, 2023, March 1, 2023, and April 7, 2023, respectively, purportedly pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1). 2-ER-55, 3-ER-307, 3-ER-466. Each Plaintiff subsequently filed a motion to remand in his/their respective case. 4-ER-895, 4-ER-885, 5-ER-910.

In opposition to Plaintiffs' motions to remand, Defendants argued that: (1) through their participation in the Meaningful Use program[3] they are "acting under a federal officer because the federal government incentivizes, regulates, monitors, and supervises [their] actions as part of the Meaningful Use program 'in order to meet the federal government's national priority of interoperable health information technology,' and Cedars-Sinai is helping the government produce the 'nationwide, interoperable information technology infrastructure for health information'"; (2) "in the absence of [their] actions, the government 'would be left alone to complete its mission'"; (3) "the government has specified how to best enhance patient engagement, including through a patient portal"; and (4) "the government has created an office dedicated to this issue and has closely monitored the work of private entities like Cedars-Sinai." 1-ER-6, 11-12, 17-18 (citations omitted). Defendants do not assert, or point to, any governmental directive, express or implied, that they use tracking technology on their Website.

The District Court properly granted Plaintiffs' respective motions to remand. 1-ER-3, 9, 15. The District Court held that a private firm's compliance (or

---

[3] The Meaningful Use program provides incentives for "eligible professionals (EPs), eligible hospitals and critical access hospitals (CAHs) participating in Medicare and Medicaid programs that adopt and successfully demonstrate meaningful use of certified electronic health record (EHR) technology." Medicare and Medicaid Programs; Electronic Health Record Incentive Program, 75 FR 44314-01. The goal of the Meaningful Use program is to "improve the use of electronic health records and health care quality over time." 42 U.S.C. § 1395w-4.

noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase "acting under" a federal "official," and that is so "even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored." *Id.* (internal quotations and citations omitted). The District Court further held that "[c]ourts 'may not interpret § 1442(a) so as to "expand the scope of the statute considerably, potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries."'" *Id.* (quoting *Cnty. of San Mateo v. Chevron Corp.,* 32 F.4th 733, 757 (9th Cir. 2022), *cert. denied sub nom. Chevron Corp. v. San Mateo Cnty., California,* 143 S. Ct. 1797 (2023) (quoting *Watson v. Philip Morris Cos., Inc.,* 551 U.S. 142, 153 (2007)). The District Court concluded that "[t]he directions Cedars-Sinai points to are general regulations and public directives regarding the development of health information technology and an electronic health records infrastructure. Therefore, removal is not justified by federal officer jurisdiction." *Id.*

## V.     SUMMARY OF THE ARGUMENT

Defendants' removal of these three consolidated actions was improper, and the District Court properly remanded them to State Court.

First, Defendants have not demonstrated that they were acting under the direction of a federal officer through their participation in the Meaningful Use

program. The "acting under" element of the federal officer removal statute requires something akin to an agency relationship as opposed to broadly applying to any entity doing business with the federal government. It requires Defendants to demonstrate that their relationship with the federal government was an unusually close one that involved subjection, guidance, control, detailed regulation, monitoring, or supervision.

Defendants, relying on regulations and rules broadly applicable to all health care providers, fail to establish the requisite level of control. A highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone, even where regulation is highly detailed and even if the private firm's activities are highly supervised and monitored. For this reason alone, the Court should affirm the District Court's remand order.

Second, Defendants failed to demonstrate any causal connection between the actions Defendants purportedly took at the direction of a federal officer and Plaintiffs' claims. Defendants concede that the act for which they are being sued is their integration of tracking code into their Website that led to the non-consensual disclosure to Facebook and other third parties of Plaintiffs' confidential health information. The Strategic Plans and Bulletin – published by the very federal officers that Defendants contend they were "acting under" – make clear that maintaining the privacy and confidentiality of patients' electronic health

information was of the utmost importance and that the federal government did not ask Defendants to integrate the tracking code at issue here into their Website. Thus, Defendants cannot base removal on a contention that they engaged in that conduct *because of* what they were asked to do by the Government. They were not asked or directed to do this.

Finally, Defendants failed to identify a colorable federal defense that arises out of their official duties. Defendants' argument that they have "a duty-based defense under HIPAA" (Br. at 46) is wrong. To the extent Defendants complied with HIPAA – and they did not – that compliance did not result from official duties. HIPAA provides the federal floor of privacy protections and does not disturb more protective rules or practices. It is therefore not a federal defense to Plaintiffs' claims. Defendants do not point to any conflict between HIPAA's requirements and the laws under which Plaintiffs bring their claims.

Therefore, this Court should affirm the District Court's Orders remanding these three consolidated actions to State Court.

## VI. STANDARD OF REVIEW

This Court reviews "questions of statutory construction and subject matter jurisdiction de novo." *Cnty. of San Mateo,* 32 F.4th at 746,citing *Ritchey v. Upjohn Drug Co*., 139 F.3d 1313, 1315 (9th Cir. 1998). *See also Lively v. Wild Oats Markets, Inc*., 456 F.3d 933, 938 (9th Cir. 2006) ("We review de novo a district

court's decision to remand a removed case and its determination that it lacks subject matter jurisdiction.").

The party who invoked the federal court's removal jurisdiction has the burden of establishing federal jurisdiction. *See Enrich v. Touche Ross & Co.*, 846 F.2d 1190, 1195 (9th Cir. 1988) (citing *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97 (1921)). To protect the jurisdiction of state courts, removal jurisdiction is strictly construed in favor of remand. *Harris v. Bankers Life & Cas. Co.*, 425 F.3d 689, 698 (9th Cir. 2005) (citations omitted). Any doubt as to the right of removal must be resolved in favor of remand to state court. *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992).

## VII.  ARGUMENT

### A.  Defendants Were not Acting Under the Direction of a Federal Officer.

The federal officer removal statute provides for removal of actions "brought against any person acting under an officer of the United States" in performing "some act under color of federal office[.]" 28 U.S.C. § 1442(a)(1). Defendants seek to stretch the "acting under" requirement in a manner that would swallow a broad range of businesses and entities that are merely complying with government regulations. Doing so would be inconsistent with the language, context, and history of 28 U.S.C. § 1442(a)(1) and controlling case law.

1.     **Even a Broad Reading of the Federal Officer Removal Statute Does Not Support Defendants' Position.**

While recognizing that 28 U.S.C. § 1442(a)(1) is to be read broadly to meet its purpose of protecting the operations of the federal government from hostile state interference, the United States Supreme Court has made clear that this "broad language is not limitless" and that "a liberal construction nonetheless can find limits in a text's language, context, history, and purposes." *Watson,* 551 U.S. at 147. As the Court noted in *Watson*:

> The statute's history and this Court's cases demonstrate that its basic purpose is to protect the Federal Government from the interference with its 'operations' that would ensue were a State able, for example, to 'arres[t]' and bring 'to trial in a State cour[t] for an alleged offense against the law of the State,' 'officers and agents' of the Government 'acting . . . within the scope of their authority.' State-court proceedings may reflect 'local prejudice' against unpopular federal laws or officials . . . and States hostile to the Government may impede enforcement of federal law . . . or deprive federal officials of a federal forum in which to assert federal immunity defenses . . . .

*Id.* at 142 (internal citations omitted).

That history is reflected in many of the cases cited by Defendants, which address interference in actions taken by federal officers or employees in the course of their duties. *See, e.g., Tenn. v. Davis*, 100 U.S. 257, 260 (1879) (Br. at 30) (state criminal action against "an officer of the United States . . . a deputy collector of internal revenue" for actions taken in his official duties); *Az. v. Maypenny*, 451 U.S. 232, 234-35 (1981) (Br. at 32) (addressing state action against a Border Agent

arising from on-duty actions); *Willingham v. Morgan*, 395 U.S. 402 (1969) (Br. at 30) (addressing a state claim brought by a federal prisoner against a federal warden and prison physician). The cases notably do not address the actions of a private, non-governmental entity participating in a generally-applicable government program.

Notably, in *Watson*, the Court found limits in the liberal construction of the federal officer removal statute, holding that "acting under" pursuant to 28 U.S.C. § 1442(a)(1) "does *not* include simply *complying* with the law." 551 U.S. at 152 (emphasis in original). Instead, the "acting under" element of the federal officer removal statute requires something "akin to an agency relationship," *i.e.*, a relationship involving "subjection, guidance, or control" or a relationship that "is an unusually close one involving detailed regulation, monitoring, or supervision," as opposed to broadly applying to any entity doing business with the Federal government. *Watson,* 551 U.S. at 151, 153. Defendants, relying on regulations and rules broadly applicable to health care providers, fail to establish the requisite level of control. Br. 34-36.

> **2.** **Defendants' Compliance with Government Regulations does not Constitute "Acting Under" the Direction of a Federal Officer.**

Defendants contend that by "build[ing] and maintain[ing] [their] website and Patient Portal" and participating in the Meaningful Use program they meet the "acting under" requirement of 28 U.S.C. § 1442(a)(1). Br. at 31, 34-35. Defendants

are incorrect. Compliance with the regulations that govern the Meaningful Use program is not sufficient to constitute "acting under" the direction of a federal officer.

"The upshot is that a highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone," even where the "regulation is highly detailed and even if the private firm's activities are highly supervised and monitored." *Watson*, 550 U.S. at 153. Thus, Defendants' submission of "reports regarding its progress on Meaningful Use objectives" and other participation in the Meaningful Use program does not make Defendants anything more than "highly supervised."

In *Watson*, the Supreme Court warned against "[a] contrary determination [that] would expand the statute's scope considerably, potentially bringing within it state-court actions filed against private firms in many highly regulated industries. **Nothing** in the statute's language, history, or purpose **indicates a congressional intent to do so**." *Id.* at 145 (internal citations omitted) (emphasis added). *See also Cty. of San Mateo*, 32 F.4th at 757 (same).

This Court has followed the Supreme Court's warning, applying the federal officer removal statute such that "the word 'under' must refer to what has been described as a relationship that involves 'acting in a certain capacity, considered in relation to one holding a superior position or office.' That relationship typically

involves 'subjection, guidance, or control.'" *Cabalce v. Thomas E. Blanchard & Assoc.*, 797 F.3d 720, 728 (9th Cir. 2015) (quoting *Watson,* 551 U.S. at 151). *Cabalce* involved a defendant's storage and destruction of fireworks pursuant to a contract between the defendant and the federal government. *Id.* at 727-28. There, this Court held that the defendant failed to establish that it was acting under a federal officer's directions where the defendant could not point to "contractual provisions or specifications from a federal officer relevant to its destruction of the seized fireworks." *Id.*

In *Saldana v. Glenhaven Healthcare, LLC,* 27 F.4th 679 (9th Cir. 2022), this Court again addressed the "acting under" requirement. In that case, a nursing home contended it was acting under a federal officer because: (a) during the COVID-19 pandemic, the federal government "conscript[ed] . . . private entities" such as the defendant "through detailed and specific mandatory directives" resulting in "operational control amounting to more than compliance with government regulations"; and (b) the nursing home was "part of the nation's critical infrastructure." *Id.* at 684-85. This Court rejected both contentions.

Regarding the former, this Court held that the memoranda containing the purported government directives "show nothing more than regulations and recommendations for nursing homes[.]" *Id*. at 685. This Court further held that "[w]ithout more than government regulations and recommendations," the

defendant "has failed to establish that it was 'acting under' a federal official and it has not identified a duty of the federal government that it performed." *Id.*

Regarding the "critical infrastructure" contention, this Court held that the nursing home's "status as a critical infrastructure entity does not establish that it acted under a federal officer or agency, or that it carried out a government duty." *Id.* at 685. According to the Court, "'[i]t cannot be that the federal government's mere designation of an industry as important—or even critical—is sufficient to federalize an entity's operations and confer federal jurisdiction.'" *Id.* (quoting *Buljic v. Tyson Foods, Inc.*, 22 F.4th 730, 740 (8th Cir. 2021)).[4]

This Court also addressed the "acting under" requirement of the federal officer removal statute in *City & Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101 (9th Cir. 2022). In connection with its holding that the defendants in that case were not acting under a federal officer, this Court found that the regulations and orders relied on by the defendants were "general regulations that applied to everyone rather than 'unusually close' direction or supervision." *Id.* at 1109 (quoting *Watson*, 551 U.S. at 153).

---

[4] *Papp v. Fore-Kast Sales Co., Inc.* 842 F.3d 805 (3d Cir. 2016), relied on by Defendants (Br. 41), is distinguishable. At issue in that case were actions taken by the defendant "while working under a federal contract to produce an item the government needed, to wit, a military aircraft, and that the government otherwise would have been forced to produce on its own." *Id.* at 813. Defendants here were not working under a federal contract to provide something the government would have otherwise produced on its own.

Just as this Court rejected the defense arguments in *Cabalce*, *Glenhaven*, and *Sunoco LP*, it should reject Defendants' arguments here. This conclusion is underscored by the fact that the Courts of Appeal for the Second, Third, Fifth, Sixth, and Seventh Circuits have each issued similar rulings to those discussed above, halting efforts to turn compliance with widely-applied COVID-19 directives into a means of avoiding state court jurisdiction over state law claims. *See Solomon v. St. Joseph Hosp.*, 62 F.4th 54, 63 (2d Cir. 2023) ("Defendants do not 'act under' a federal officer simply because they operate in a heavily regulated industry."); *Sherod v. Comprehensive Healthcare Mgmt. Servs., LLC*, No. 20-3287, 2023 WL 6290741, at *5 (3d Cir. Sept. 27, 2023) (defendant's compliance with federal regulation and guidance did not mean it was acting under a federal officer.); *Hudak v. Elmcroft of Sagamore Hills*, 58 F.4th 845, 859 (6th Cir. 2023) ("'[T]he help or assistance necessary to bring a private person within the scope of the statute does not include simply complying with the law.'") (quoting *Watson*, 551 U.S. at 152); *Martin v. Petersen Health Operations, LLC*, 37 F.4th 1210, 1213 (7th Cir. 2022) ("[R]egulation does not turn a private entity into a public actor."); *Mitchell v. Advanced HCS, L.L.C.*, 28 F.4th 580, 589-91 (5th Cir. 2022) (same, rejecting "attempt[] to both transform a preemption defense into a grant of jurisdiction and recast private healthcare companies as deputies of the federal government").

Contrary to Defendants' assertion (Br. at 36-37), this Court's holding in *Cnty. of San Mateo*, 32 F.4th 733, is well-applied to the facts at bar. At issue in that case were: (a) fuel supply contracts between the defendants and the United States military that provided for, *inter alia*, inspection of "delivery, site, and operations"; and (b) a separate agreement limiting oil production "to ensure the availability of oil reserves in the event of a national emergency." *Id.* at 758. In holding that the contracts and agreement were insufficient to meet the "acting under" standard, this Court found that "[m]ere 'compl[iance] with the law, even if the laws are "highly detailed" and thus leave [an] entity "highly regulated,"' does not show that the entity is 'acting under' a federal officer." *Id.* at 760 (citations omitted). According to the Court, "Standard [Oil Co.] and the government reached an agreement that allowed them to coordinate . . . in a way that would benefit both parties." *Id.* at 759.

\*     \*     \*

Defendants have provided the Court with no basis to determine that their "assistance" "in the Meaningful Use program" is sufficient to establish that they were "acting under" direct federal authority. Their contentions that they are carrying out a "basic governmental task" and establishing "federal infrastructure" fair no better. Br. at 34, 39.

### 3. Defendants Wrongly Apply Appellate Court Jurisprudence.

While Defendants rely heavily on *Isaacson v. Dow Chem. Co.*, 517 F.3d 1237 (2d Cir. 2008) (Br. at 33-35, 43), in *Cabalce*, this Court readily distinguished that decision:

> In *Isaacson*, the federal government contracted with several chemical companies to develop Agent Orange. The Second Circuit held that federal officer removal was proper because "the Government knew that Agent Orange contained dioxin, and the Government controlled the method of formulation. The action that Plaintiffs challenge, the production of dioxin, naturally would have occurred during the performance of these government-specified duties. . . ."

797 F.3d at 730, n.4 (internal citations omitted). Unlike the defendants in *Isaacson*, Defendants, here, point to no terms instructing, requiring, or even allowing them, to use tracking pixels to disclose PII and PHI to third parties, nor do they point to any indicia that the federal government was aware of their use of such tracking pixels. Instead, Defendants were, as this Court held in *Cabalce*, complying with regulations that "define[d] [the defendant's] duties . . . in general terms[.]" *Id.* at 728. Applied to the facts at bar, Defendants' engagement in the Meaningful Use program does nothing more than establish a framework "in general terms," which does not suffice to meet the "acting under" requirement. *Id.*

Defendants' reliance on *Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237 (9th Cir. 2017) (Br. *passim*), fares no better. *Goncalves* addressed whether the defendants, providers of health insurance to federal employees

pursuant to the Federal Employees Health Benefits Act ("FEHBA"), were acting under a federal officer in pursuing subrogation claims. *Id.* at 1242. Under the FEHBA, the federal government was "responsible for the overall administration of the program" and maintained "direct and extensive control" over the health benefits contracts with the defendants. *Id.* at 1246. Indeed, pursuant to the contracts with the federal government, the defendants in *Goncalves* were "obligated to make a 'reasonable effort' to pursue subrogation claims[,]" the very acts that formed the basis of the lawsuit. *Id.* at 1248.[5]

Here, Defendants point to no contract provisions like those at issue in *Goncalves*, instead pointing to "incentive payments" available to any participant in the Meaningful Use program. Br. at 34. Nothing about those payments suggests the "direct and extensive control" at issue in *Cabalce*. Receipt of incentive payments does not establish the "special relationship" required by *Watson*, 551 U.S. at 157.[6]

---

[5] Defendants' reliance on *Jacks v. Meridian Res. Co.*, 701 F.3d 1224 (8th Cir. 2012) (addressing subrogation claims under FEHBA contract) (Br. at 41) fails for the same reason.

[6] Defendants seize on the Supreme Court's use of the term "payment" once in *Watson* to argue that where there is payment there is delegation of federal authority. Br. at 35. However, read in context, the "payment" the Court was looking for was in the nature of compensation for performing pursuant to a contract with, as an agent of, or as an employee of the government, not incentive payments allowed for voluntarily participating in a government program. *Watson*, 551 U.S. at 156 ("[W]e have found no evidence of any delegation of legal authority from the FTC to the industry association to undertake testing on the Government agency's behalf. Nor is there evidence of any contract, any payment,

- 24 -

*See Quinto v. Regents of the Univ. of Cal.*, No. 3:22-cv-04429-JD, 2023 WL 1448050, at \*2 (N.D. Cal. Feb. 1, 2023) ("receiving incentive payments for acting in a way that promotes a broad federal interest—in an area outside the traditional responsibility of the federal government—is not the same as being contracted to carry out, or assist with, a basic governmental duty.").

Finally, Defendants' effort to analogize this action to a series of actions involving rural electric cooperatives (Br. at 37-39) ignores the fact that, unlike here, the revenue distributions sought in each of those actions were alleged to be in conflict with and preempted by federal regulations and loan requirements under the Rural Electrification Act. For instance, in *Butler v. Coast Elec. Power Ass'n*, 926 F.3d 190 (5th Cir. 2019), members of rural electric cooperatives sued the cooperatives in state chancery court under Mississippi Code § 77-5-235(5), which requires cooperatives to return excess revenues to members. *Id.* at 194. The Fifth Circuit's primary holding was that the defendants had stated a colorable federal preemption defense. The court found that "[t]he cooperatives are not merely regulated entities; rather, they are 'instrumentalities of the United States' that 'act under' [Rural Utilities Service's] (federal agency) direction based on a close and

---

any employer/employee relationship, or any principal/agent arrangement.") Likewise, Defendants submitted no such evidence here.

detailed lending relationship and shared goal of furthering affordable rural electricity."

Similarly, in *Caver v. Cent. Ala. Elec. Coop.,* 845 F.3d 1135 (11th Cir. 2017), the Eleventh Circuit applied the federal officer removal statute in an action where state law required distribution of "excess revenue," which conflicted with federal loan requirements and related federal regulations under the rural electrification act. *Id.* at 1139. This, coupled with the court's recognition that "rural electric cooperatives are something more than public utilities; they are instrumentalities of the United States," supported its determination that removal of the action to federal court was justified. *Id.* at 1143 (internal quotation and citation omitted). *See also Cessna v. Rea Energy Coop., Inc.*, 753 F. App'x 124, 127-28 (3d Cir. 2018) (same). Here, as discussed below (*infra*, § VII.C.), Defendants do not assert a colorable preemption defense, nor do they have a "close and detailed" relationship with the federal government, nor are they anything close to "instrumentalities of the United States." Defendants are merely private businesses regulated by the federal government, and they have failed to establish that, by participating in the Meaningful Use program, they were "acting under" the federal government.

- 26 -

**4. Defendants' Effort to Tether Federal Jurisdiction to the "Meaningful Use Program" Has Been Widely Rejected.**

No appellate court has held that compliance with or participation in the Meaningful Use program constitutes "acting under" a federal officer. Defendants instead ground their argument on two opinions issued by out of circuit district courts, *Doe v. UPMC*, No. 2:20-cv-359, 2020 WL 4381675 (W.D. Pa. July 31, 2020) and *Doe v. ProMedica Health Sys., Inc.,* No. 3:20 CV 1581, 2020 WL 7705727 (N.D. Oh. Oct. 30, 2020). Br. at 25, 35, 39, 40, 44, 48. Every district court decision to date from within the Ninth Circuit addressing this issue has rejected Defendants' argument and the reasoning in *UPMC and ProMedica Health Sys., Inc. See Gibson v. Stanford Health Care*, No. 23-cv-02320-BLF, 2023 WL 741337, at *5 (N.D. Cal. Nov. 9, 2023) ("Stanford's voluntary participation in the Meaningful Use Program is insufficient to establish that it was 'acting under' a federal officer"; declining to follow *UPMC* and *ProMedica Health Sys., Inc.*); *Valladolid v. Mem'l Health Servs.*, No. CV 23-3007-MWF (ASX), 2023 WL 4236179, at *11-12 (C.D. Cal. June 27, 2023) (granting remand motion; not following *UPMC* or *ProMedica Health Sys., Inc.*); *Doe v. Hoag Mem'l Presbyterian Hosp.,* No. SACV 23-00444-CJC (ADSx), 2023 WL 3197716, at *3 (C.D. Cal. May 2, 2023) ("[d]efendant has not shown that it acted under the direction of a federal officer or agency" and noting that "the Meaningful Use program neither authorizes nor obligates the federal government to create such an

infrastructure itself") (quotation and citation omitted); *Quinto*, 2023 WL 1448050, at \*3 (finding reliance on *UPMC* and *Promedica* "misplaced" and holding that those cases relied on an "overly broad interpretation of what it means to assist a federal superior with its tasks or duties"); *Crouch v. St. Agnes Med. Ctr.,* No. 1:22-cv-01527-ADA-EPG, 2023 WL 3007408, \*5 (E.D. Cal. Apr. 19, 2023) (same and quoting *Cnty. of San Mateo*, 32 F.4th at 756 in holding that "[d]efendant's participation in the Meaningful Use Program does not establish a 'close relationship[] with the federal government' to show that Defendant was acting with or for a federal officer").

District courts outside the Ninth Circuit have similarly rejected Defendants' argument and the reasoning of *UPMC* and *ProMedica Health Sys., Inc. See, e.g., Doe v. SSM Health Care Corp.*, No. 4:23-cv-00022-SRC, 2023 WL 5662099, at \*5 (E.D. Mo. Aug. 22, 2023) (criticizing *UPMC,* "this non-binding precedent does not supply any substantive analysis of whether the MUP implicates a basic government function or whether federal officers act as the superiors of participants" in the Meaningful Use program); *Doe v. Christ Hosp.*, No. 1:23-cv-27, 2023 WL 4757598, at \*9 (S.D. Ohio July 26, 2023) ("the Court finds *UPMC* and *ProMedica* unpersuasive. In particular, they take an overly broad view of what counts as assisting with a federal task. In this Court's view, it takes more than merely acting in the public's interest or supporting a general federal policy to qualify."); *Martin*

*v. LCMC Health Holdings, Inc.*, No. 23-411, 2023 WL 4540547, at *2 (E.D. La. July 5, 2023) ("since 2020, twelve district court decisions have addressed federal officer removal on the basis of a theory substantially similar to Defendants', and all but two have rejected Defendants' position"); *Doe v. Redeemer Health*, No. 23-2405, 2023 WL 6323089 at *4 (E.D. Pa. Sept. 28, 2023) (rejecting *UPMC* because it "turns on the [] improper analogy between voluntary incentive programs and governmental contracts" and noting that *ProMedica* simply adopted *UPMC's* holding without further analysis); *Beauford v. Johns Hopkins Health Sys. Corp.*, No. JKB-23-0660, 2023 WL 4237373, *4 n.3 (D. Md. June 27, 2023) (finding the reasoning of *UPMC* and *ProMedica* "[un]persuasive"); *Doe v. UMass Mem'l Health Care, Inc.*, No. 22-cv-12022-ADB, 2023 WL 4538239, at *4 (D. Ma. July 13, 2023) (rejecting the reasoning of *UPMC* and holding that "the fact that the federal government provides incentive payments to Defendant for its participation in the Program does not create a contractor relationship in and of itself"); *Colleton v. UMass Mem'l Health Care, Inc.*, No. 22-cv-40154-ADB, 2023 WL 4538178, at *5 (D. Ma. July 13, 2023) ("participation in the Meaningful Use Program is merely compliance with federal law and is not sufficient to bring it within the scope of the federal officer statute").

In sum, Defendants have not demonstrated they were "acting under" an officer of the United States for purposes of 28 U.S.C. § 2442(a)(1), and on that basis, this Court should deny their appeal.

### B. No Causal Connection Exists Between Actions Defendants Were Purportedly Asked to Take Pursuant to a Federal Officer's Direction and Plaintiffs' Claims.

Beyond failing to satisfy the "acting under" element of the federal officer removal statute, Defendants also fail to satisfy the "causal connection" element, which requires that a defendant show by a preponderance of the evidence a causal connection between the plaintiff's claims and the actions the defendant purportedly took pursuant to a federal officer's direction. *See Cnty. of San Mateo*, 32 F.4th at 746, 755. Non-governmental entities "must demonstrate that the acts for which they are being sued . . . occurred *because of* what they were asked to do by the Government." *Isaacson*, 517 F.3d at 137, *cited with approval in Goncalves*, 865 F.3d at 1244-45 (emphasis in original).

As a threshold matter, this case does not even reach the "causal connection" element because, as discussed above, Defendants have failed to meet their burden of proving by a preponderance of the evidence that they were acting under a federal officer. *See Cnty. of San Mateo*, 32 F.4th at 760 (not considering causal connection element where defendants failed to show they were "acting under" a federal officer); *Sunoco LP*, 39 F.4th at 1107 (same). To the extent the Court

considers the element, Defendants cannot meet their burden of showing the requisite causal connection.

As Defendants concede, the act for which they are being sued is Defendants' integration of tracking code into their Website that led to the non-consensual disclosure of Plaintiffs' confidential health information to Facebook and other third parties. Br. at 43-44 (*citing* 4-ER-607, 609, 638-53; 3-ER-585-86, 592-93; 3-ER-446, 453-63). However, Defendants did not engage in this act "because of what they were asked to do by the Government." *See Isaacson*, 517 F.3d at 137.

As the record reflects, between 2011 and 2020, HHS, through the Office of the National Coordinator for Health Information Technology ("ONC"), published three successive strategic plans (the "Strategic Plans") for working with the private and public sectors to realize the government's health information technology agenda. *See* 2-ER-157-288; SER-061-111. Defendants referred to these strategic plans in opposing Plaintiffs' remand motions. SER-019 n.6; SER-024; SER-047; SER-052; 2-ER-40-41.

According to the *Federal Health Information Technology Strategic Plan (2011-2015)* (the "2011 Strategic Plan"), "[p]rotecting the privacy and security of health care information, and ensuring the safe use of health technology, have long been core responsibilities of the government." 2-ER-185. As noted in the 2011 Strategic Plan, in connection with moving towards electronic health records

("EHRs"), the government was well aware that "EHRs and other health IT will enhance the quality and value of health care . . . *only if there are appropriate protections in place to keep health information private and secure.*" *Id.* (emphasis added). Indeed, the 2011 Strategic Plan expressly provides that it was HHS' "*policy that the privacy and security of individually identifiable health information should be protected* wherever it is electronically transmitted, maintained, or received." *Id.* at 187 (emphasis added); *see also id.* at 188 ("In order for . . . patients to have trust in health IT and information exchange, they must be confident that privacy and security laws are in place and will be enforced.").

The subsequent strategic plans in 2015 and 2020 underscored the importance of protecting patients' electronic health information. For instance, the *Federal Health IT Strategic Plan (2015-2020)* makes clear that "[a]s more health information transitions to electronic formats that are shared commonly, *it is important that all stakeholders recognize their responsibility in protecting health information.*" SER-085 (emphasis added). Relatedly, the *2020-2025 Federal Health IT Strategic Plan* states that "[k]eeping [electronic health information] secure, preventing breaches and fraud, and curtailing other harms is crucial for maintaining patients' trust of [sic] their healthcare providers and in health IT." 2-ER-277.

In addition to the Strategic Plans, in December 2022, HHS issued the Bulletin (*see*, *supra*, § IV.A.) in which it expressly stated that use of the technology integrated into Defendants' Website is prohibited when used in the manner alleged by Plaintiffs:

> **Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosure of PHI to tracking technology vendors or other violations of the HIPAA rules**. For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.

3-ER-506 ¶¶ 102-06; RJN Ex. A; *see also* 3-ER-442-43, 446-51; 3-ER-586, 590-95; 4-ER-607-08, 610-22, 628-30.

The Strategic Plans and Bulletin – published by the federal officers that Defendants contend they were "acting under" – make clear that maintaining the privacy and confidentiality of patients' electronic health information was of the utmost importance and that the federal government did not ask Defendants to integrate the tracking code at issue here into their Website. Thus, Defendants cannot credibly contend they engaged in that conduct "because of what they were asked to do by the Government." *See Isaacson*, 517 F.3d at 137.

Defendants conveniently ignore the very documents they submitted in support of their opposition to Plaintiffs' remand motions and seek to redefine the act for which they have been sued. *See* Br. at 42-46. According to Defendants: (a)

this case is about the use of the "Meta pixel to understand activity on [their] website and promote interactions with [their] Patient Portal"; and (b) the "Patient Portal is critical to [their] efforts to achieve the Meaningful Use goals of patient use of their electronic health records." *See id.* at 44. As discussed above, those statements directly contradict Defendants' own description of Plaintiffs' allegations. *See* Br. at 43-44 (stating that Plaintiffs allege that the integration of tracking code into Defendants' Website that led to the non-consensual disclosure to Facebook and other third parties of Plaintiffs' confidential health information). Even if Defendants wanted to understand Website activity and promote interactions with the Website, those goals did not allow Defendants to surreptitiously disclose patients' confidential health information – information the federal government expressly sought to protect.

Defendants' reliance on *Goncalves* (Br. at 44) is misplaced. As discussed above (*see, supra,* § VII.A.3), there, unlike here, the defendants contended the very act that formed the basis for the conduct challenged by the plaintiff – *i.e.*, seeking subrogation – was an act performed under the direction of federal officers. 865 F.3d at 1245.

Defendants' reliance on *ProMedica* (Br. at 44) is similarly misplaced. As discussed above (*see, supra,* § IV.A.4), every district court decision to date from within the Ninth Circuit addressing this issue has rejected the reasoning in that

case. Moreover, the court in *ProMedica* did not address the federal government's various published statements showing that it did not want hospitals to violate patients' privacy rights.

Unable to show they integrated the tracking code at issue into the Website because the government asked them to do so, Defendants try to justify their conduct by claiming the federal government uses similar technology. Br. at 40, 45. For support, Defendants cite to the privacy policy of the Centers for Medicare & Medicaid Services ("CMS"). *Id.* However, that assertion does not meet any part of Defendants' burden here. Regardless, nothing about the CMS privacy policy demonstrates that the federal government asked Defendants to integrate the tracking code and technology at issue into their Website. Nor does the privacy policy state that the CMS website covertly disclosed confidential patient information to third-party vendors. In fact, it specifically says, "We don't collect any PII/PHI with these tools." 4-ER-870.

Defendants' related "sky is falling" argument, that allowing this case to proceed in state court "could chill nationwide meaningful-use efforts" (Br. at 45-46), was not made in the district court, and the Court should not consider it. *See AMA Multimedia, LLC v. Marcin Wanat,* 970 F.3d 1201, 1213-14 (9th Cir. 2019); SER-004-60. Furthermore, the argument has no legal or factual basis. As a matter of law, the argument is not grounded in the factors to be considered in determining

the propriety of removal under the federal officer removal statute. *See Cnty. of San Mateo*, 32 F.4th at 755. As a matter of fact, Defendants provide no grounds for their conclusory assertion. Indeed, Defendants have not even provided evidence that this case has resulted in any reduction in the usage of their own Website or patient portal.

Defendants failed to demonstrate that the acts for which they are being sued occurred *because of* what they were asked to do by HHS.

### C.  Cedars-Sinai Lacks a Colorable Federal Defense.

To "'assert a colorable federal defense'" the "defense must 'aris[e] out of [defendant's] official duties.'" *Sunoco LP*, 39 F.4th at 1110 (internal citations omitted). Where "the defenses fail to stem from official duties or are not colorable," removal is improper. *Id.* Here, as discussed above, Plaintiffs' complaints do not arise out of Defendants' official duties. *See, supra,* § VII.A. Nor are Defendants' defenses colorable.

*Sunoco LP* is on point. There, the plaintiffs alleged "that oil and gas companies knew about climate change, understood the harms energy exploration and extraction inflicted on the environment, and concealed those harms from the public." 39 F.4th at 1106. The defendants removed the case to federal court, and argued that "the government-contractor defense, preemption, federal immunity, the Interstate and Foreign Commerce Clauses, the Due Process Clause, the First

Amendment, and the foreign affairs doctrine" presented colorable defenses that justified removal. *Id.* at 1110. This Court disagreed and held the proffered defenses either did not "stem from official duties or [were] not colorable." *Id.* This was particularly true because "Defendants' conclusory statements and general propositions of law [did] not make their defenses colorable." *Id.*

The same result should occur here. Defendants' argument that they have "a duty-based defense under HIPAA" (Br. at 46) is wrong. To the extent Defendants complied with HIPAA—which they did not, and they did not submit evidence that they did—that compliance did not arise from official duties. *See Sunoco LP*, 39 F.4th at 1110 ("Defendants do not contend that the government ordered their allegedly [unlawful] acts."). As discussed throughout, Defendants were not acting under a federal officer. Any compliance with HIPAA's regulations was nothing more than Defendants complying with the law.

Relatedly, HIPAA is not a federal defense to Plaintiffs' claims. "HIPAA provides the 'federal floor of privacy protections that does not disturb more protective rules or practices.'" *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 47 F. Supp. 3d 1069, 1082 (D. Haw. 2014); *Hidalgo-Semlek v. Hansa Med., Inc.*, 498 F. Supp. 3d 236, 258 (D.N.H. 2020) ("HIPAA provides a floor of privacy protections for a person's individually identifiable health information and does not preempt state privacy laws that provide greater protection than HIPAA.") And

while HIPAA preempts contradictory state-law requirements, *see, e.g.*, 42 U.S.C. § 1320d-7(a)(1), 45 C.F.R. § 160.203, Defendants do not point to any conflict between HIPAA's requirements and the laws under which Plaintiffs bring their claims.

Defendants' reliance on *Smith v. Facebook*, 262 F. Supp. 3d 943 (N.D. Cal. 2017) (Br. at 47), is misplaced. Contrary to Defendants' contention, the court in *Smith* did not hold that HIPAA provides a defense based on compliance with official duties. In *Smith*, the court merely held that the disclosed information at issue did not constitute "sensitive medical information" and, therefore, the defendant was not required to meet a stricter discloser standard under HIPAA. 262 F. Supp. 3d at 954-55.

Defendants' contention that they have a "colorable implied preemption defense" under *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001) (Br. at 48), similarly fails. In *Buckman Co.*, the Supreme Court held that a state-law claim for "fraud on the FDA" was barred by principles of conflict preemption. *Id.* at 347-48. The plaintiffs' theory in that case was that the defendant had violated a duty owed to the FDA by committing a fraud on the agency in the course of obtaining approval to market a product and that, "[h]ad the representations not been made, the FDA would not have approved the [product], and plaintiffs would

not have been injured." *Id.* at 343. In rejecting that theory, the Supreme Court found:

> [T]he plaintiffs' state-law fraud-on-the-FDA claims conflict with, and are therefore impliedly pre-empted by, federal law. The conflict stems from the fact that the federal statutory scheme amply empowers the FDA to punish and deter fraud against the Administration, and that this authority is used by the Administration to achieve a somewhat delicate balance of statutory objectives. The balance sought by the Administration can be skewed by allowing fraud-on-the-FDA claims under state tort law.

*Id.* at 348. Defendants have identified no similar conflict between Plaintiffs' state law claims and HIPAA.

Citing to *In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457 (3d Cir. 2015), Defendants argue that the preemption defense applies here. Br. at 49. Not so. In that case, the Third Circuit found a colorable *Buckman* defense where a plaintiff's claim was based on the Federal Community Defender's alleged non-compliance with the terms of a federal grant from the Administrative Office of the U.S. Courts. *Id.* at 474. By contrast, this case involves no allegation that Defendants violated any duties owed to the federal government. Plaintiffs' claims are based purely on duties Defendants owed to them – *i.e.*, Plaintiffs' right not to have their electronic communications intercepted or disclosed without consent. As discussed above, the federal government expressly stated that it did not want hospitals, like Defendants,

to disclose patients' electronic health information to third parties. *See, supra,* §§ IV.A., VII.B. *Buckman* is wholly inapposite here.

In sum, Defendants' "conclusory statements and general propositions of law do not make [their] defenses colorable." *Sunoco LP*, 39 F.4th at 1110. As such, Defendants have not met the final requirement for federal officer removal.

## VIII. CONCLUSION

For all of the reasons stated above, Plaintiffs request that this Court affirm the decision of the District Court.

DATED:     November 27, 2023

By:  /s/ *Rachele R. Byrd*
     Rachele R. Byrd

WOLF HALDENSTEIN
ADLER FREEMAN &
HERZ LLP
Rachele R. Byrd
750 B Street, Suite 1820
San Diego, CA 92101
(619) 239-4599
(619) 234-4599 (fax)

*Counsel for Plaintiff/
Appellee John Doe*

By:  /s/ *Scott R. Drury*
     Scott R. Drury

DRURY LEGAL, LLC
Scott R. Drury
6 Carriage Lane
Highwood, Illinois 60040
312/358-8225
scott@drurylegal.com

BURSOR & FISHER, PA
Lawrence T. Fisher
Brittany Scott
1900 N. California Blvd.
Suite 940
Walnut Creek, CA 94956
(925) 300-4455
(925) 407-2700 (fax)
ltfisher@bursor.com
bscott@bursor.com

*Counsel for
Plaintiff/Appellee Jarrod
Browne*

By:  /s/ *Samuel M. Ward*
     Samuel M. Ward

BARRACK RODOS &
BACINE
Samuel M. Ward
600 West Broadway
Suite 900
San Diego, CA 92101
(619) 230-8088
(619) 230-1874 (fax)
sward@barrack.com

*Counsel for
Plaintiffs/Appellees Steven
Beltran and Lisa Reingold*

## DECLARATION REGARDING CONCURRENCE

I, Rachele R. Byrd, am the CM/ECF User whose identification and password are being used to file this Joint Answering Brief of Plaintiffs-Appellees John Doe, Jarrod Brown, Steven Beltran and Lisa Reingold. In compliance with Ninth Circuit Rule 25-5(e), I hereby attest that Scott R. Drury and Samuel M. Ward have concurred in the content of this filing.

DATED: November 27, 2023      By:  _/s/Rachele R. Byrd_
                                       Rachele R. Byrd

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
Rachele R. Byrd
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599

*Counsel for Plaintiff/Appellee John Doe*

## <u>STATEMENT OF RELATED CASES</u>

The following cases pending in this Court are related because they raise the same or closely related issues: *El Camino Hospital v. Spalinger*, Case No. 23-16206; *Hoag Memorial Hospital Presbyterian v. Doe*, Case No. 23-55500; *Memorial Health Services v. Valladolid*, Case No. 23-55668.

30095v5

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-55466, 23-55474, 23-55557

I am the attorney or self-represented party.

**This brief contains** 9,284 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

● complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

■ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Rachele R. Byrd **Date** Nov. 27, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*